## Drake Standard Machine Works v. William Brossman.

### Gen. No. 13.350.

1. RES IPSA LOQUITUR—*doctrine of, defined.* Proof of an injury occurring as the proximate result of an act which, under ordinary circumstances, would not, if done with due care, have injured any one, is enough to make out a presumption of negligence. And this is held to be the rule even where no special relation, like that of passenger and carrier, exists between the parties.

2. RES IPSA LOQUITUR—*how question whether presumption of negligence has been rebutted determined.* Whether or not the defendant offered such explanation of the accident as to relieve itself from the charge of negligence, and whether or not the plaintiff exercised due care for his own safety, are questions of fact for the jury.

3. RES IPSA LOQUITUR—*what does not preclude reliance upon.* Neither the request by the plaintiff of an instruction which is in effect that if the jury believe from the evidence that the plaintiff has proved his case as alleged in the declaration by a preponderance of the evidence the verdict should be for him, nor the averring of negligence in each of the several counts of his declaration, nor the introduction of evidence in support of such allegations of negligence, precludes the plaintiff from relying in the trial and in the Appellate Court upon the doctrine of res ipsa loquitur.

4. VERDICT—*what essential to preserve for review question as to whether, is contrary to the evidence.* In order to preserve for review the question as to whether the verdict is contrary to the evidence, it is essential that a motion for a new trial be interposed and that after such motion has been overruled an exception be preserved and an assignment of error made, questioning the action of the court in overruling such motion for a new trial.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed July 1, 1907.

O. W. DYNES, for appellant.

IRVING W. BAKER and SIMON KRUSE, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment for the sum of

210     APPELLATE COURTS OF ILLINOIS.

VOL. 135.]     Drake Stand. Mach. Wks. v. Brossman.

$2,000 recovered by appellee against appellant. The declaration consists of two counts. In the first count it is averred, in substance, that March 5, 1903, the defendant was engaged in the business of manufacturing heavy machinery at, to-wit, 300 W. Jackson boulevard, in the city of Chicago, and there maintained a factory in which it carried on said business, and which was provided with divers cranes, hoists, etc., and other devices for lifting and handling said machinery; and on said day plaintiff had control of and was managing a team of horses and a wagon, and was on defendant's said premises with said team and wagon, by the request and invitation of defendant, for the purpose of permitting defendant to haul and load certain heavy machines onto said wagon, which, after being loaded, plaintiff would haul away from said premises, at defendant's request, to such places as defendant might designate to plaintiff; and plaintiff, by like request, was assisting defendant's servants to load a certain heavy machine on said wagon by means of certain chains, cranes, hoists, lifts, tackle, and other devices, furnished and maintained by defendant for said purpose, and controlled and managed by defendant. After averring the defendant's duty in the premises, negligence is thus averred:

"Yet the defendant, not regarding its duty in that behalf, then and there negligently and carelessly furnished and provided a certain unsafe, defective and dangerous chain, hook, crane, hoist, tackle or device, for lifting a certain heavy and ponderous piece of machinery of great weight, to-wit, 20,000 pounds, and then and there furnished and equipped the said crane, hoist or tackle with a certain defective, unsafe and dangerous chain and hook, which said defendant then and there well knew to be unsafe, defective and dangerous, or in the exercise of due care in that behalf might have known; and then and there so negligently and carelessly controlled, managed and operated the

said crane, hoist and tackle and said chain and hook and said device, which were then and there furnished by appellant for the purpose of hoisting a certain piece of heavy machinery onto the said wagon, and because of the negligence and carelessness of the defendant as aforesaid, while the said heavy piece of machinery was so being hoisted, the said crane, hoist and tackle, and said chain and hook then and there broke, slipped, parted and gave way, and then and there the said heavy piece of machinery then and there fell and was precipitated to and upon the hand of the plaintiff, by means whereof plaintiff's hands and fingers were greatly wounded and torn," etc.

In the second count negligence is averred as follows: "Yet the defendant, not regarding its duty in that behalf owing, as aforesaid, then and there, negligently and carelessly and insufficiently fastened, or failed to fasten, adjust and arrange the said lift and tackle, then and there being used for the purpose of hoisting the said machine or piece of machinery onto said wagon of plaintiff, as aforesaid, to, upon, and around said machinery or piece of machinery; so that while the said machine and piece of machinery was being hoisted, as aforesaid, onto the said wagon, the said chain and hook slipped, broke and parted, and gave way, and then and there permitted and allowed the said ponderous piece of machinery to fall with great force and violence to and upon said wagon of plaintiff there and to fall upon and against the plaintiff there," etc.

The defendant pleaded the general issue, the jury found defendant guilty and assessed plaintiff's damages at the sum of $2,000, and the court, after overruling a motion of defendant for a new trial, rendered judgment on the verdict.

At the time of the accident, March 5, 1903, plaintiff was a teamster in the employ of the J. C. Zipprich Teaming Co. of the city of Chicago, and had frequently been sent by said company to defendant's fac-

212    APPELLATE COURTS OF ILLINOIS.

VOL. 135.]    Drake Stand. Mach. Wks. v. Brossman.

tory to haul machinery from there, to some railroad depot or track, and on the occasion in question was sent there by his employer to get a machine and haul it to the Illinois Central Railroad depot. When he arrived at the factory he inquired of the foreman whether the machine was ready, who told him it was, and he backed his wagon into the building from an adjoining alley, to receive the machine on it. When he backed in the hind end of the wagon was north and the horses were headed south. The machine was about thirty feet north of where the wagon stood, when backed in, and about two feet above the floor, resting on horses made of planks. Chains were fastened to it, for the purpose of hoisting it by means of the overhead tackle, and a dolly hook, and when it was hoisted about five feet, it was shoved south by a Yale hoist, which traveled on an overhead trolley until it was directly over the wagon, when an order was given to lower it, and it was lowered accordingly. When the order was given the plaintiff was on the west side of the wagon, hooking some blocks on the rear end of it, for the machine to rest on when lowered, so that there would be a clearance between the machine and the wagon, and so as to keep the machine level, the hind part of the wagon being lower than the front; and also for convenience in unloading at the depot platform. While plaintiff was thus engaged, and when the machine was lowered to within about a foot of the wagon, a hook, called a grab-hook, which was attached to one of the chains wound about the machine to hoist and lower it by, broke, and the machine fell, and plaintiff's hand was injured by being caught between the machine and one of the blocks, or between the machine and the wagon, which does not definitely appear from the evidence. The machine was what is called a concrete mixer. It is thus described by the plaintiff: The machine was about 18 feet long, 4½ feet across, about 3½ high, and weighed,

according to my judgment, 6,000 pounds. He says he did not know its weight, and merely guessed at it.

Chris Peterson, foreman and a machinist, who had been in defendant's employ thirteen years, testified that the machine was 17 feet and 8 inches long and weighed between 3,800 and 3,900 pounds.

Fred W. Dreyer, also a machinist in defendant's employ, and who directed the loading of the machine, testified: "The machine that we were hoisting at that time was between 18 and 19 feet long, and weighed between 3,800 and 3,900 pounds. The bottom portion, where the two timbers are, was about 4 feet 6 inches wide. The size of the timbers that ran along its base was 8 inch. They were 8 inch oak timbers. The trough was made of boiler iron, I believe. The machine was about 26 inches high from the floor to the upper edge of the trough. The upper surface of the trough was about 30 inches wide. From the level of the upper edge of the hopper to the dolly hook there was between 8 and 10 inches." He further testified that the grab-hook which broke was about nine or ten inches below the upper edge of the hopper. The dolly hook that was suspended from above was about eight or ten inches higher than the edge of the hopper, and the hook that broke was about eighteen inches from the dolly hook measured on a straight line. The main contests on the trial were as to the grab-hook, its age, capacity, and whether it had been properly inspected and tested, and as to the manner in which the chains were adjusted on the machine for the purpose of hoisting it, in order to load it on the wagon.

Appellant's counsel says in his brief, "The chain and hook in question were purchased from a reputable chain manufacturing company that tested its chains before placing them on the market." No reference is made to record or abstract in support of this statement, and the statement is not sustained by the evidence. It

214 APPELLATE COURTS OF ILLINOIS.

VOL. 135.] Drake Stand. Mach. Wks. v. Brossman.

is not improbable, however, that counsel, in his zeal for his client, placed a construction on the testimony of Charles E. Conley, a witness called by defendant, which it will not bear. He testified that he was a salesman connected with the Jones & Laughlin Steel Company, which makes chains and deals in chains largely, and that the company had sold chains to the defendant, that defendant was one of its customers. Certainly it cannot be inferred from this testimony that the defendant purchased the chain in question from the Jones & Laughlin Steel Company, or that said company is a reputable company, or that it tests its chains before putting them on the market. The evidence of Mr. Drake, appellant's president and secretary, in reference to the age of the chain, was, "I should judge that chain was two or three years old, maybe a little over two years. I do not think it was over three. We did not make the chain ourselves; we bought it. There were half a dozen chains, or such a matter. I am not as well acquainted with the shop end of the work as the regular foreman. I handle the business end of it."

If the chain was bought by the defendant, it would seem not to be a difficult matter to prove when, where and from whom it was purchased, yet the record is barren of any such evidence. The evidence is that the hook which broke was seven-eighths of an inch square, and that the links of the chain to which it was attached were one-half inch in diameter, and that the hook had an eye at the upper or shank end, and that the fracture was about the center of the bent part. Also, that the bend of the hook was so constructed as to present on its inner or bearing surface, one of the angles of the square piece of metal of which it was made.

On the trial, defendant's counsel produced the shank of a hook and so much of the bend as reached to the point of fracture, or center of the bend, with three links of chain attached to the upper end of the shank,

and examined and cross-examined the witnesses in reference to the same, on the hypothesis that it was part of the broken hook and the chain to which it was attached when it broke.   After the plaintiff had closed his evidence in chief, Peter Rasmussen, called by defendant, testified that, looking at the part of hook and the three links of chain attached to it, he would say, that as far as he could see, it was a piece of the hook that broke.   Mr. Drake, called by defendant, testified that he kept in his office, for the trial, the piece of chain produced, and that it was a piece of the broken chain.   Neither the remainder of the chain nor of the hook was produced.

Dreyer, witness for defendant, testified: "I do not know where the other portion of the hook is.   It was brought in the office at that time.   I believe I brought it in myself; but I won't swear to it."

Plaintiff testified that he saw the other part of the hook in defendant's office about two or three days after the accident; that Mr. Drake and his foreman showed it to him.

George Wilkins, who was in defendant's employ at the time of the accident, as blacksmith, testified that Mr. Boyles, defendant's superintendent, came to him in the blacksmith shop after the hook broke, and asked him his opinion of the hook, which was lying there on the face plate.

The accident occurred March 5, 1903, and summons in the suit was served on the defendant April 17, 1903; and it was evident that the defendant was preparing soon thereafter for trial, because it not only preserved the piece of hook and chain above referred to, but May 14, 1903, had statements prepared for two of the witnesses of the accident, and procured their signatures thereto.   The parts of the hook and chain produced were used by defendant's counsel as above stated, in the cross-examination of plaintiff's witnesses and the direct examination of defendant's witnesses,

216    APPELLATE COURTS OF ILLINOIS.

VOL. 135.]    Drake Stand. Mach. Wks. v. Brossman.

and numerous questions -were asked by defendant's counsel as to the appearance of the piece of the hook exhibited to them, and it is obvious that it was very material that the other part of the broken hook should have been produced. There was no evidence whatever that it was lost, or of any search made for it, or that it was not in the power of the defendant to produce it. There was no evidence that the grab-hook was on the chain when it was purchased, or that it is customary for manufacturers of such chains to attach grab-hooks to them, before marketing them, and the evidence tends to prove the contrary.

Wilkins, defendant's blacksmith, was asked, "If hooks are placed on chains, the blacksmith is supposed to do it, is he not?" A. "Yes, sir, as a rule they do; that is, if a hook is brought there, you add it to the chain, or put another link on."

The following appears in the cross-examination of William Glader, a witness called by defendant: "This link was put into that link; that is, their manufactured link, and this one is not. This one is made, probably, at the same time the hook was made." (Witness refers to the link attaching the hook to the chain as being the one put in at the time the hook was made.)

Dreyer, defendant's witness, testified that the part of the chain not produced was in defendant's shop, and Chris Peterson, defendant's witness, testified that the part of chain not produced was being used by the defendant.

Plaintiff's counsel in his argument says: "The part containing the eye and attached to a few links of chain was produced in court and *sent to the jury room,* although notice was served on appellant's counsel, prior to the trial, to produce the entire appliance." This is not denied by defendant's counsel in his reply argument, but as we think, impliedly admitted. He says, "While it is true that we have not tied the chain and hook to the bill of exceptions, it is

nevertheless a complete answer to say to the foregoing contention, to point out that the chain and hook are minutely described and the fractured surface or area minutely and repeatedly described by different witnesses in different parts of the record.'' This is said in answer to the contention of plaintiff's counsel that there being physical evidence before the jury, which is not before the court, the verdict should not be disturbed.

Plaintiff who saw both pieces of the broken hook in defendant's office two or three days after the accident, testified that in the curve where it broke there was a darkish color close to the edge, and it looked worn, as if it had been used quite often, and that the hook broke right in the curve.

Lindner, one of the defendant's employes, who assisted in loading the machine on the wagon, testified that he saw the hook after it broke; that it broke right in the middle, in the deepest part of the curve, and there was a sort of flaw of rust there, he should think about one-eighth inch deep, toward the axis of the hook, and that he called attention to this in the office; that he didn't know how deep the worn part of the hook was, as he didn't measure it, but, in his best judgment, it was worn about a quarter of an inch. Also, that the hook was worn down in the middle, where the loads would hang on it, and the sharp edge was smoothed out, that there was no sharp corner there as far as he could remember, that the hook had four angles, one being in the middle.

George Wilkins, the blacksmith, testified that he examined the hook after it broke, and that there was a gall in it; that it showed a dark spot right where the hook was bent back (here witness remarked, ''I wish I could get the hook to show what I mean'') on the inside of the hook, I should judge about a quarter-inch, and was one-eighth inch deep, and the rest of it was a clean break, and that, no doubt, it was covered

218     APPELLATE COURTS OF ILLINOIS.

VOL. 135.]     Drake Stand. Mach. Wks. v. Brossman.

over by a fuller. In cross-examination he describes a gall thus: "It appeared to be a gall made in bending the hook. In other words, when the hook is turned, it creases like the instep of a shoe, when it is doubled up." In the examination in chief of this witness, in reference to the hook, the plaintiff's counsel asked defendant's counsel for the piece of the hook which he had produced in the examination of the next previous witness, when defendant's counsel said, "No, I won't let you have the hook." Immediately afterward plaintiff's counsel asked witness if the hook which defendant's counsel was handling yesterday was a piece of the hook which broke, and witnessed answered, "Well, I could tell better if I saw it and had it in my hand. It resembles it in general appearance." On cross-examination defendant's counsel showed witness the piece of hook which he had produced, and asked him if it looked like the same hook which he examined at the time of the accident, and witness answered: "No, sir, it doesn't look like the hook. I cannot find any mark or flaw on this hook; but I will swear that there was one on it, and I am telling the truth and nothing but the truth."

Lindner, who had been in defendant's employ for six months next before the accident, and Wilkins, who had been in its employ from June 1, 1901, both testified that they did not see or know of any inspection of the grab-hook prior to the accident. Rasmussen, witness for defendant, testified that he did not examine or inspect the chain in question any more than did any of the others, and did not know of anyone inspecting the chains, and that he did not look the chains over very closely before using them.

Dreyer, defendant's witness, testified: "In reference to inspecting these hooks and chains, will say that I looked over the chains principally to see if there was anything on them to show that they were not safe. That would take about two, three, four or five minutes each time. I looked them over every time I had to

pick up a machine." He says, in another part of his testimony, that the hook and chain in question were lying at the machine and he picked it up and put it around the timber.

It does not appear from the evidence that the chain and hook in question were ever tested, except by the defendant, by means of using them to hoist loads heavier than the machine in question, and it is not claimed by defendant's counsel that there was any other test made by the defendant, or at all. The defendant introduced evidence tending to prove that the appearance of the piece of hook produced on the trial indicated that it was of good, sound metal and of sufficient capacity to sustain a much heavier load than the machine in question. There was also evidence tending to prove that the grab-hook, by reason of being where it was placed, in putting chains around the machine to hoist it by, namely, nine or ten inches below the hopper, was subjected to a much greater strain than it would have been had its position been different. The defendant introduced evidence tending to prove that the chain and hook in question had been used in hoisting much heavier machines than the one in question, and that such test was sufficient; also, defendant produced expert witnesses, who, being examined with reference to the piece of the broken grab-hook shown to them, testified that the carrying capacity of the grab-hook was much greater than the weight of the machine in question. For instance: Eugene T. Skenkle, a consulting engineer, testified that he had examined the piece of hook, with three links of chain attached, used on the trial, and was questioned and answered as follows:

"Q. If that hook is used as a grab-hook and hooked across the link of a chain on one side of a weight of 3,850 pounds running diagonally from the supporting dolly hook to the point of connection, bent slightly by the side of the trough on the machine which is being

220 APPELLATE COURTS OF ILLINOIS.

Vol. 135.]     Drake Stand. Mach. Wks. v. Brossman.

lifted about half way between the dolly hook and the point of connection, state whether, in your opinion, such a hook is of sufficient size and strength—other things being equal—for use of that character and lifting such a weight. A. Amply so.

"Q. How much weight, in your judgment, is a hook attached in that way capable of holding? A. Attached to a load of that description, I should say from three to four tons."

Yet the fact is that the hook broken when sustaining a load of about 3,850 pounds plus 100 pounds, the weight of Lindner, who was on top of the machine while it was being lowered, for the purpose of lowering it onto the wagon.

On his cross-examination he testified that he assumed that the hook was made of first-class material, unworn, uncrystallized and without defect, latent or obvious. It is difficult, if not impossible, to understand this expert witness. He says, on his cross, "I have not made the assertion that this hook has a carrying capacity of from three to four tons. I said, on that hook, in connection with a chain of like area, I would not hesitate to put ten tons. I have said that this hook has a carrying capacity of three or four tons, but that is not what I mean," etc.

William Glader and James H. Sullivan, two other of defendant's expert witnesses, testified that they assumed the rest of the chain was like the piece of hook and three links shown them. Glader also testified, "I am assuming that the internal structure of the iron of which the hook is made is unstretched and uncrystallized, and that there are no defects in the iron." Sullivan, on his cross-examination, said of the breaking: "I think it was due possibly to some undue leverage."

At the conclusion of the evidence the defendant's counsel moved the court to exclude from the jury the plaintiff's evidence, and to instruct the jury to find the

Drake Stand. Mach. Wks. v. Brossman.

defendant not guilty, which motion the court over-
ruled, and counsel contends this was error.   The evi-
dence fairly tends to prove the plaintiff's case, as
stated in his declaration, and the court did not err in
refusing to take the case from the jury.   Counsel for
plaintiff contend that *res ipsa loquitur* applies; that
proof of the fact that the hook broke made a *prima facie*
case for the plaintiff and imposed on the defendant
the burden of proving, if it could, that the breaking
was not owing to its negligence.   The evidence, which
is undisputed, is that the defendant owned and fur-
nished the hook which broke, and that it was within
its exclusive care, control and management.   Also that
the plaintiff was not the servant of defendant and had
nothing to do with the loading onto the wagon of the
machine in question, and did nothing except placing
the wagon in position for loading, and putting some
blocks in the hind end of the wagon for the machine
to rest on when lowered onto the wagon.   In N. Chi-
cago St. Ry. Co. v. Cotton, 140 Ill. 486, the plaintiff
was injured by a collision between two of the defend-
ant's cars in a tunnel under the Chicago river, he being
a passenger on one of the cars.   The court, in its opin-
ion, say:   "The general rule seems to be, that proof
of an injury occurring as the proximate result of an
act which, under ordinary circumstances, would not, if
done with due care, have injured any one, is enough
to make out a presumption of negligence.   And this is
held to be the rule even where no special relation, like
that of passenger and carrier, exists between the par-
ties," and the court cite cases in support of the last
proposition, and quote with approval this language:
"There must be reasonable existence of negligence.
But when the thing is shown to be under the manage-
ment of the defendant, or his servants, and the acci-
dent is such as in the ordinary course of things does
not happen, if those who have the management use
due care, it affords reasonable evidence, in the absence

222 APPELLATE COURTS OF ILLINOIS.

VOL. 135.] Drake Stand. Mach. Wks. v. Brossman.

of explanation by the defendant, that the accident arose from want of care." This case is cited with approval in a number of subsequent decisions of the Supreme Court, among which are the following:

In Hart v. Washington Park Club, 157 Ill. 9, the plaintiff in his declaration averred in substance that the defendant was in possession of a race course, where it gave a public exhibition of horse racing, and invited the public thereto, charging an admission fee, and that he attended and paid the fee, and that the defendant so neglected its duty to keep the race ground in a reasonably safe condition, that a horse drawing a vehicle, unguarded and unattended, ran away, and against plaintiff, throwing him down and injuring him. The case went up on demurrer to the declaration, which the Supreme Court sustained, mainly on the ground that it was not alleged in the declaration, "that the runaway horse which caused the injury was under the exclusive management and control of the defendant or its servants." But the court approves the doctrine announced in the Cotton case *supra,* and cites text writers and a number of cases in which "the maxim *res ipsa loquitur*" was applied. *Ib.* p. 15, *et sequens.*

See also, N. Y. etc. R. R. Co. v. Blumenthal, 160 Ill. 40, affirming Same v. Same, 57 Ill. App. 538.

The law as announced in the Cotton case is also supported by decisions in other jurisdictions. Houston v. Brush et al., 66 Vt. 331, 343-6, citing numerous cases; Graham v. Badger, 164 Mass. 42; Cummings v. Nat. Furnace Co., 60 Wis. 603; Railway Co. v. Hopkins, 54 Ark. 209; Excelsior Elec. Co. v. Sweet, 57 N. J. L., 224-228; Gerlach v. Edelmeyer, 47 N. Y. S'r Ct. 292, 297, affirmed 88 N. Y. 645; Griffin v. Boston & Albany R. R. Co., 1 Lawyers Rep. Ann., 698 (Mass.).

Sack v. Dolese, 137 Ill. 129, relied on by the defendant's counsel, has no application. In that case the plaintiff was a servant of the defendant, and *res ipsa loquitur* is not, as a general rule, applicable where

Drake Stand. Mach. Wks. v. Brossman.

the plaintiff is such servant. Joliet Steel Co. v. Shields, 146 Ill. 603, 607.

We are of opinion that *res ipsa loquitur* applies to the facts of this case. Defendant's counsel in his reply argument contends that it is not applicable to the present case and cannot be invoked in this court, because: (1) It was not relied on by plaintiff in the trial court; (2) the record does not contain the necessary elements to support it; and (3) even were the necessary elements present, the evidence for the defense would rebut and overcome it.

The second ground of the contention requires no consideration in addition to what we have already said. As to the third ground, we need only quote, for the present, the language of the court in N. C. etc. R. R. Co. v. Cotton, 140 Ill. 486: "Whether or not the defendant offered such explanation of the accident as to relieve itself from the charge of negligence, and whether or not the plaintiff exercised due care for his own safety, were questions of fact for the jury." Counsel in support of the first ground of his contention refers to the plaintiff's first instruction, which is, in effect, that if the jury believe, from the evidence, that the plaintiff has proved his case as alleged in the declaration, by a preponderance of the evidence, the verdict should be for him; then refers to the negligence averred in each of the two counts of the declaration, and says that the plaintiff cannot, in this court, advance a different theory from that on which he proceeded in the trial court, citing cases as to change of theory. We find nothing in the instruction referred to, or in the declaration, which precluded the plaintiff, in the trial court, or which precludes him here, from relying on *res ipsa loquitur,* and do not think the cases cited as to change of theory applicable. It is averred in each count of the declaration that "said chain and hook then and there broke, slipped, parted and gave way." The plaintiff, on the trial, produced evidence other than evidence of the breaking of the hook, but

224    APPELLATE COURTS OF ILLINOIS.

VOL. 135.]    Drake Stand. Mach. Wks. v. Brossman.

while this may have been unnecessary, and perhaps irregular, it did not there, nor does it here, preclude him from relying on the presumption arising from the breaking of the hook. Wood v. Ry. Co., 12 Montgomery Co. Law Rep. 155 (Sup. Ct. Penn.).

On page 23 of the reply argument for the defendant, counsel impliedly, but perhaps not intentionally, assumes that the plaintiff was co-operating in the performance of the work which gave rise to his injury. We have already shown what the plaintiff did before and was doing at the time of the accident, and it is shown by the evidence for the defendant that he was not assisting in loading the wagon. Dreyer, who had charge of the loading, testified that he and Rasmussen adjusted the chains on the machine for the purpose of hoisting it and lowering it onto the wagon, and that they twisted the chains around the dolly hook; also that Ernest Lindner was helping. He was standing on the machine to hoist and lower it.

Mr. Drake, defendant's president, testified: "It was customary for the dray and horses to back up upon the premises. My employes were loading the machine."

It is assigned as error and argued that the verdict is against the weight of the evidence, but the overruling of defendant's motion for a new trial is not assigned as error, and plaintiff's counsel contend that such being the case, the question as to the weight of the evidence is not before us. The motion for a new trial was in writing, specifying grounds for the motion, and among the specified grounds is, that the verdict is contrary to and against the weight of the evidence. The defendant excepted to the overruling of the motion, and has assigned as error that the verdict is contrary to and against the weight of the evidence, but, as heretofore stated, has not assigned error in overruling the motion for a new trial, and the question presented is, whether in this state of the record, we can properly consider whether the verdict is or is not

contrary to the weight of the evidence. Section 61 of the Practice Act is as follows: "Exceptions taken to the decisions of the court, overruling motions in arrest of judgment, motions for new trials, motions to amend and for continuance of causes, shall be allowed and the party excepting may assign for error any decision so excepted." A statute allowing such exceptions as the foregoing was first passed in 1837. "Statute Laws of Illinois" (published in 1839), p. 540, section 2. The section significantly concludes: "and the party excepting may assign for error any opinion so excepted to, any usage to the contrary notwithstanding."

Before the act of 1837 was passed the granting of a new trial rested in the discretion of the trial court. Sawyer v. Stephenson, Beecher's Breese, 24.

Johnson v. Moulton, 1 Scam. 532, was tried in the Circuit Court before the passage of the act of 1837. On appeal, the appellant assigned as error, "1st. The judgment of the Circuit Court was given against the weight of testimony," in respect to which the court say: "In relation to the first error assigned, it is a well-settled rule of law in trials by jury, that the weight of testimony is to be decided by the jury exclusively."

In Field v. The People, 2 Scam. 79, the court said in reference to the statute in question: "The statute allowing exceptions to the decisions of the Circuit Court on grounds heretofore decided not to be reviewable in this court, does not embrace the present case," etc.

In Hill v. Ward, 2 Gilm. 285, 292, the court say: "Before the passage of the law of this state of the 21st day of July, 1837, Session Laws 109, the granting or refusing a new trial rested in the discretion of the court before which the case was tried, and could not be assigned as error." Since the passage of the act of 1837 it has been frequently held that the proper way in which to present to a reviewing court the question whether the verdict was contrary to the weight of the evidence, is to except to the overruling

226 APPELLATE COURTS OF ILLINOIS.

VOL. 135.]  Drake Stand. Mach. Wks. v. Brossman.

of a motion for a new trial, and to assign such overruling as error, and such has been the usual practice. I. B. & W. R. R. Co. v. Rhodes, 76 Ill. 285; Shaw v. The People, 81 ib. 150.

The foregoing decisions show that the act of 1837, which has been continued through all revisions of the statute till now, grants to plaintiffs in error and appellants an advantage which did not exist by the common law practice, namely, to bring before a reviewing court, for its consideration and decision, the question whether the verdict of the jury in the cause is or was contrary to the weight of the evidence, and the statute prescribes, in terms, what any one seeking such advantage must do, viz.: except to the overruling of the motion for a new trial and assign such overruling as error. The act grants a new right, and prescribes how it shall be exercised, and by necessary implication, we think, excludes any other mode. In this respect it is similar to the statute in respect to appeals, in regard to which it is well settled that one seeking to take advantage of the statute must act strictly in accordance with it.

In Allen v. State, 74 Ind. 216, the court say: "Where rulings constitute proper grounds for a new trial, they cannot be assigned, on appeal, as independent errors. If presented to the trial court by the proper motion, they are covered by an assignment on that motion; if not so presented, they can not be made available in this court." See, also, Elliott's Appellate Procedure, sec. 347.

In Chicago G. W. Ry. Co. v. Gitchell, 95 Ill. App. 1, the Appellate Court for the Second District held that the appellant, having failed to assign as error the overruling of the motion for a new trial, the question of the sufficiency of the evidence to sustain the verdict was not before the court. Our conclusion is that, in the absence of an assignment that the trial court erred in overruling a motion for a new trial, no question as

to the weight of the evidence is properly before us for consideration. It may not, however, be improper to say that were it otherwise, it would not avail the defendant.

Defendant's counsel contends that the plaintiff was guilty of negligence which contributed to the injury, in being in such position that the machine in falling could injure his hand; that the court erred in sundry rulings on evidence; that counsel for plaintiff made improper remarks in his argument to the jury, and that the damages are excessive. We have carefully considered all these matters, including the evidence of the injury to the plaintiff's hand, with the result that we would not feel warranted in reversing the judgment for any error assigned or argued. All instructions given to the jury, twenty-three in number, were given at defendant's request, and the only one refused was that peremptorily instructing the jury to find the defendant not guilty.

The judgment will be affirmed.

*Affirmed.*